# NO. 12-22-00079-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *KALI DANIELLE TERRY,*<br>*APPELLANT* | § | *APPEAL FROM THE 349TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *ANDERSON COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Kali Danielle Terry appeals her convictions for murder and tampering with evidence with intent to impair a human corpse. In a single issue, Appellant contends the evidence is insufficient to support her convictions. We affirm.

### BACKGROUND

Appellant was charged by indictment with the murder of Robert Kirk Stanley[1] and tampering with evidence with intent to impair a human corpse. Appellant pleaded "not guilty," and the matter proceeded to a jury trial. The jury found Appellant "guilty" of both charges and assessed her punishment at thirty years imprisonment for the murder charge and twenty years imprisonment, along with a $10,000 fine, for the tampering charge. The trial court sentenced Appellant accordingly, and this appeal followed.

---

[1] The victim was commonly referred to as "Kirk" both during his life and during trial testimony. Therefore, we refer to the victim by that name.

In her sole issue, Appellant contends the evidence is insufficient to support her convictions. Specifically, she urges that the accomplice testimony is uncorroborated and fails to show she acted in concert with the accomplice.

## Standard of Review and Applicable Law

The *Jackson v. Virginia*[2] legal sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the state is required to prove beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson*, 443 U.S. at 315–16, 99 S. Ct. at 2786–87; *see also Escobedo v. State*, 6 S.W.3d 1, 6 (Tex. App.–San Antonio 1999, pet. ref'd). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789; *see also Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The evidence is examined in the light most favorable to the verdict. *See Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789; *Johnson*, 871 S.W.2d at 186. A jury is free to believe all or any part of a witness's testimony or disbelieve all or any part of that testimony. *See Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.–Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *See Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2217–18, 72 L. Ed. 2d 652 (1982).

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Rodriguez v. State*, 521 S.W.3d 822, 827 (Tex. App.–Houston [1st Dist.] 2017, no pet.) (citing *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011)). Each fact need not point directly and independently to the guilt of the appellant, provided that the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Juries are permitted to draw multiple reasonable inferences so long as each inference is supported by the evidence presented at trial. *Id*. at 15. Juries are not permitted

---

[2] 443 U.S. 307, 315-16, 99 S. Ct. 2781, 2786-87, 61 L. Ed. 2d 560 (1979).

to reach conclusions based on mere speculation or factually unsupported inferences or presumptions. *Id*. An inference is a conclusion reached by considering other facts and deducing a logical consequence from them, while speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Id*. at 16.

The sufficiency of the evidence is measured against the offense as defined by a hypothetically correct jury charge. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would include one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *Id*.

As applicable to this case, a person commits murder if she (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2019). These methods of committing murder are not separate offenses, but alternative methods of committing the same offense. *Smith v. State*, 436 S.W.3d 353, 378 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *Lozano v. State*, 359 S.W.3d 790, 821 (Tex. App.—Fort Worth 2012, pet. ref'd); *see Aguirre v. State*, 732 S.W.2d 320, 325–26 (Tex. Crim. App. [Panel Op.] 1982) (op. on reh'g) (holding that an indictment alleging theories of both intentional and knowing murder and felony murder did not allege different offenses, but only different ways of committing the same offense); *accord Barfield v. State*, 202 S.W.3d 912, 916 (Tex. App.—Texarkana 2006, pet. ref'd). A person commits tampering with evidence with intent to impair a human corpse if, knowing that an offense has been committed, the person alters, destroys, or conceals a human corpse with intent to impair its verity, legibility, or availability as evidence in any subsequent investigation or official proceeding relating to the offense. *See* TEX. PENAL CODE ANN. § 37.09(d) (West Supp. 2022).

A person is criminally responsible as a party to an offense if the offense is committed by her own conduct, by the conduct of another for which she is criminally responsible, or by both. *Id*. § 7.01(a) (West 2021). A person is criminally responsible for an offense committed by the conduct of another if while "acting with intent to promote or assist the commission of the offense, [s]he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id*. § 7.02(a)(2) (West 2021). To establish guilt under the law of the parties, the

evidence must show that, at the time of the offense, the parties were acting together, each contributing some part toward the execution of their common purpose. ***Barrientos v. State***, 539 S.W.3d 482, 490 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

**Accomplice Testimony**

Jesse Kellebrew testified that he previously pleaded "guilty" to Kirk's murder and is currently in prison. According to Kellebrew, he received a call from Appellant and her husband, Daniel Terry, that they had a problem with Kirk and needed Kellebrew's help. Appellant picked up Kellebrew from his mother's house. According to Kellebrew, Daniel told him that Kirk threatened their son "over a can of raviolis" and wanted him to take care of it. Kellebrew understood that to mean they wanted him to "beat the dude up."

According to Kellebrew, Daniel lured Kirk out of his house. Kellebrew followed Kirk back inside, and then he and Daniel began hitting Kirk. Kellebrew testified that he hit Kirk with his hands and a metal bar. Daniel strangled Kirk with a rope and stabbed him with a kitchen knife to ensure he was dead. Kellebrew testified that Daniel called Appellant and told her to bring the truck around. Per Kellebrew, Appellant did not know what happened until she saw the body being placed in the truck and she began "freaking out." Daniel stayed at Kirk's house to clean up the blood, while Appellant went with Kellebrew to dump the body. According to Kellebrew, Daniel told Appellant to get in the truck with Kellebrew and bring the truck back. Kellebrew drove the truck, and Appellant was a passenger. Kellebrew claimed that he did not toss out Kirk's clothes or hat. But he described exiting the truck and dumping Kirk's body while Appellant remained in the vehicle.

**Non-accomplice Evidence**

Christian Janes testified that she was neighbors with the Terrys in November 2019. Kirk was her roommate in November 2019. According to Janes, Kirk previously made a comment that Appellant should have had an abortion instead of having her son and that Janes's daughter told Appellant about the comment. On the night in question, as Janes left her home, she told the Terrys that Kirk was inside because they previously told her they needed to talk to Kirk about money he owed them. The next morning, she got a call from Scott Reagan. She met him at a gas station. According to Janes, Reagan was acting "frantic, crying, just panicked." Based on what he told her, she went to the Palestine Police Department and then the Anderson County Sheriff's Office and reported a murder had been committed in her house.

4

Reagan testified that he went to Janes's house on the evening of November 5, 2019. She was leaving and asked him to make sure no one took anything from her house. At some point, Reagan, who was in his truck playing on his telephone, saw Daniel and Kirk enter Janes's house and later saw other people entering Janes's house. He also testified that Appellant left and returned with Kellebrew. At one point, he heard some noises but did not see anything. He eventually saw a truck leave. When Janes called him about taking out the trash, he went inside to find the trashcans, saw blood, and fled. Reagan called Janes and met with her to disclose what he saw. Thereafter, Janes went to the Palestine Police Department and the Anderson County Sheriff's Office to report that a murder was committed in her house.

Johnnie Stanley, Kirk's daughter, testified that she lived with the Terrys in November 2019. On the night in question, she returned home from work early in the morning between 2:00 and 4:00 a.m., and Daniel was on the front porch. She did not see Appellant. Johnnie went inside to shower. On her way from the shower to her room, Appellant and Daniel appeared tense and walked to their room. Johnnie knocked and they did not answer. Johnnie assumed they were high on drugs and went to bed. The next morning, she went outside to smoke a cigarette and noticed Detective Bobby Bishop with the Anderson County Sheriff's Office in the driveway. He asked her about a blood trail in the driveway. Johnnie stated that she thought it was from a "roadkill deer that got brought home," and he informed her that Kirk was missing.

Robert Frakes, an investigator with the Anderson County Sheriff's Office, testified that when he interviewed the Terrys, Appellant indicated she had not seen Kirk in three to four days. He testified that the Terrys agreed to speak with law enforcement at the Sheriff's Office.

Ryan Tolliver, formerly with the Anderson County District Attorney's Office, assisted in the search for Kirk. While at the Sheriff's Office, he saw Appellant's vehicle and "in plain view" saw what appeared to be blood in the back on the truck, the bed, and around one of the tire wells. The blood was later determined to be human.

Ginger Lively, formerly with the Anderson County Sheriff's Office, was captain of the criminal investigation division (CID) in November 2019. At Janes's house, Lively observed blood droplets and a ring, later identified as belonging to Kirk, outside. Lively contacted the Texas Rangers to assist with the investigation. When Lively went to the Sheriff's Office to meet with Appellant and Kellebrew, she saw blood in the back of Appellant's truck and some of the blood had dripped out. A presumptive test showed human blood.

Lively interviewed Appellant, who gave differing stories: that she had not seen Kirk in days, that she was with Kellebrew and Daniel was at the house, and that she and Kellebrew left to have sex. Lively testified that Appellant's stories "didn't add up" with victim's information they had been provided by Life 360. After approximately the fourth lie, Lively told Appellant that they had her truck. Appellant admitted that she could show the authorities the body's location. According to Lively, Appellant was very calculated in her answers and was not emotional in any aspect. At Appellant's direction, officers found Kirk's body. After they found the body, Appellant took them on a route to find Kirk's shoes and cap, which she claimed Kellebrew threw out the window. Lively testified that Appellant gave a detailed description of the clothing items. After discussions with all of the suspects, law enforcement determined that brass knuckles, a metal horseshoe post, and a rope were used in Kirk's murder. Daniel used the rope, while Kellebrew used the knuckles and bar. Appellant told Lively that she was told to get into the vehicle with Kellebrew on the night of the offense and was scared. Appellant also claimed that Daniel told her at some point that Kellebrew did it all. According to Lively, Appellant's complete description of the hat, shoes, and fact Kirk was shirtless shows she was aware of the body and what he was wearing before he was thrown over the bridge. Appellant also told her that she went to Kellebrew's house and returned home by herself, meaning she was in the vehicle and free to leave.

Texas Ranger Joshua Jenkins assisted the Sheriff's Office with Kirk's case. His testimony generally confirmed Lively's testimony. According to Jenkins, Appellant's stories were not adding up. Appellant initially claimed she left to have sex with Kellebrew, but Jenkins got her to admit to lying. Appellant then disclosed what happened. Jenkins subsequently interviewed Daniel. Once confronted with the fact that Appellant took officers to the body, Daniel confessed.

Daniel testified on Appellant's behalf. According to Daniel, Kirk previously made a comment that his stepson deserved to die and should have been aborted "over a can of raviolis."[3] But Daniel claimed Appellant had nothing to do with the murder. He stated that although Appellant picked up Kellebrew, he and Kellebrew decided to assault Kirk and gathered weapons from the living room to do so. Appellant was in the living room at the time. After the murder,

---

[3] The exact meaning of this phrase is unclear. However, in context, it appears to mean that the parties were eating raviolis when the comment was made.

they told Appellant what happened. Therefore, she knew Kirk had been murdered. Daniel testified that he moved the truck, not Appellant. According to Daniel, Appellant came to the truck and stood beside the driver's side door. He and Kellebrew loaded the body. Daniel stated that he wanted Appellant to get into the truck to bring it back. In his recorded interview, Daniel had told officers that Appellant drove, but at trial, he claimed he could not remember. He remembered bagging up a pair of shoes and throwing away everything that he thought belonged to Kirk.

Appellant testified that she called Kellebrew because she needed him to retrieve his belongings from her house so that she could have the house cleaned. At some point, Kellebrew became upset and Appellant thought he had left. At the time, Daniel was outside. Appellant claimed to be inside and unaware of what was transpiring outside. Later, Daniel told her to get in the truck. She denied ever seeing a body and claimed that no one would tell her what was happening. Appellant testified she was told to get in the truck because Kellebrew wanted to go home and she would bring the truck back home. When Kellebrew took a different route, she became suspicious and asked where they were going. While in the truck, she received a phone call from Daniel, who told her what had happened. At some point, Kellebrew stopped the truck, exited, and walked to the back of the truck. Appellant felt the tailgate drop and heard rustling. Kellebrew re-entered the truck and drove to his mother's house. Appellant testified that the shoes referenced by Lively belonged to Kellebrew, and that he threw them out of the truck after he dumped the body. Appellant claimed she cooperated fully with law enforcement. She also testified that, during a lunch break at trial, Kellebrew signed to her that he was sorry, he lied, and he would make things right. Appellant claimed she was scared, but admitted no one held her hostage, or threatened her with a knife or a gun. She further admitted having a cell phone, not exiting the truck and calling the police, and not calling police the next morning or later that day. She claimed she did not know there was blood in the truck until she saw the evidence at trial.

**Corroboration of Accomplice Testimony**

Appellant argues that Kellebrew's testimony was not corroborated sufficiently to satisfy the "accomplice-witness rule" found in Texas Code of Criminal Procedure, Article 38.14. Article 38.14 states, "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE

7

CRIM. PROC. ANN. art. 38.14 (West 2023). "An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the required culpable mental state." *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008) (citing *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004)); *Turner v. State*, 571 S.W.3d 283, 287 n.6 (Tex. App.–Texarkana 2019, pet. ref'd). It is undisputed that Kellebrew is an accomplice as a matter of law. *See Paredes*, 129 S.W.3d at 536 ("An accomplice as a matter of law is one who is susceptible to prosecution for the offense with which the accused is charged or a lesser included offense").

When evaluating the sufficiency of corroborating evidence under Article 38.14, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). The tends-to-connect standard does not present a high threshold because the "evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Id.*; *see Cantelon v. State*, 85 S.W.3d 457, 461 (Tex. App.–Austin 2002, no pet.). Rather, the evidence simply must link the accused in some way to the commission of the crime. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).

Such evidence "is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011) (citing *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009)). The Texas Court of Criminal Appeals has expounded on the concept as follows:

> No precise rule can be formulated as to the amount of evidence required to corroborate. The non-accomplice evidence does not need to be in itself sufficient to establish guilt beyond a reasonable doubt. Nor must the non-accomplice evidence directly link the accused to the commission of the offense. While the accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense. Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.

*Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) (citations omitted). In determining whether the nonaccomplice evidence tends to connect the defendant to the

commission of the offense, "we view the evidence in the light most favorable to the jury's verdict." **Brown**, 270 S.W.3d at 567.

Viewed in the light most favorable to the jury's verdict, the non-accomplice evidence in this case established that Appellant and Daniel were upset with Kirk because he made disparaging remarks about Appellant's son. As a result, the two planned to have Kirk assaulted. Appellant called and picked up Kellebrew for his assistance. Thereafter, Appellant observed Kellebrew and Daniel gather weapons for the assault. After Kellebrew and Daniel killed Kirk, they informed Appellant of his death. They also loaded Kirk's body into the back of the truck. Appellant then either drove or rode in the truck so she could bring it back home. The evidence also shows that Appellant provided law enforcement inconsistent and conflicting stories. She initially claimed to have not seen Kirk in days. Then she claimed to be having an affair with Kellebrew. Later, she claimed to be afraid of Kellebrew. While Appellant claimed to never see Kirk's body, she was able to describe the clothes he wore on the night in question. Thus, we conclude, based on the totality of the non-accomplice testimony, that a rational juror could find that such evidence tends to connect Appellant to the offenses. *See **Reed v. State***, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988) (combined cumulative weight of the incriminating evidence furnished by non-accomplice witnesses which tends to connect the accused with commission of offense satisfies test).

Furthermore, based on our review of the record, including the evidence recounted above, we conclude that there was ample evidence to permit the jury to find beyond a reasonable doubt that Appellant was a party to Kirk's murder and a party to tampering with evidence with intent to impair a corpse afterwards. *See* TEX. PENAL CODE ANN. §§ 7.01, 7.02, 19.02, 37.09. Appellant's sole issue is overruled.

## DISPOSITION

Having overruled Appellant's sole issue, we *affirm* the trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered April 20, 2023.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

9



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**APRIL 20, 2023**

**NO. 12-22-00079-CR**

**KALI DANIELLE TERRY,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 349th District Court

of Anderson County, Texas (Tr.Ct.No. 349CR-20-34440)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*